UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.   19-cr-10457 |
| | ) | |
| v. | ) | |
| | **)** | |
| (1) RONALD YOEL MARTE CARMONA, | ) | |
| a/k/a "Alberto Gonzalez Carmona," | ) | |
| a/k/a "Guy," | ) | |
| | ) | |

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION
TO DEFENDANT'S AMENDED MOTION TO SUPPRESS**

The Defendant's initial motion to suppress identification sought to suppress all evidence "seized during the course of a motor vehicle stop on August 15, 2019 and the subsequent identification of the defendant…."   D. 56 at 1    In opposing the motion, the United States represented that it would not offer evidence at trial regarding: (1) the false identification provided to agents by the defendant during the stop, (2) evidence of any photograph taken of the defendant during the stop, or (3) the identification of the defendant made from the photograph..   D. 63 12-13.   In response, the defendant has filed an amended motion to suppress, and now seeks to suppress all evidence seized, "during the course of a motor vehicle stop on August 15, 2019, the subsequent identification of the defendant, and all evidence seized in an arrest/search warrant executed on October 11, 2019…."   D. 82 at 1 (emphasis added).   The Defendant also asserts that relevant information was deliberately and/or recklessly omitted from the

1

affidavit supporting the arrest and search warrant applications at issue, and as such, requests a hearing pursuant to Franks v.Delaware, 438 U.S. 154 (1978) and United States v. Tanguay, 787 F3d 44 ( l51 Cir.2015).   For reasons set forth below and in the Government's Opposition to Defendant's Motion to Suppress, D.63, the United States of America, through the undersigned Assistant United States Attorney, hereby opposes the Defendant's Amended Motion.

I.  Background1

On May 21, 2019 and July 10, 2019, a cooperating source, working at the direction and under the supervision of federal investigators, made controlled purchases of suspected fentanyl from a person known to him/her as "Guy." Ex. 1 at ¶¶ 13-15. Both of the purchases were made the same way: the cooperating source exchanged text messages with "Guy" arranging the purchase a certain amount of fentanyl.   Ex. 1 at ¶ 11.  "Guy" then sent a courier to deliver the fentanyl to the source at an agreed upon location.   Ex. 1 at ¶ 11.

After purchasing suspected fentanyl on May 21 and July 10, 2019, and after arranging to purchase fentanyl on July 16, 20192, Special Agent Lawrence of the FBI sought and obtained a search warrant for cell phone data location information regarding

---

1 The Government attaches the Declaration of FBI Special Agent Albert Fonseca (hereinafter "Fonseca Declaration") and the Declaration of Detective Matthew Heslam (hereinafter Heslam Declaration").   In addition, the Government attaches ten exhibits, each discussed in the Fonseca Declaration.   The undersigned acknowledges that the government's previous Opposition, D. 63, should have attached sworn declarations of fact, and regrets the inconvenience caused.
2 As described in Exhibit 2, a sale of fentanyl arranged with "Guy" on July 16, 2019 was aborted  because of safety concerns. Ex. 1 at ¶ 15).

2

telephone number 978-398-7395 used by "Guy."  Ex. 2.  Location data obtained as a result of the July 26th Warrant indicated that the target phone was frequently used over the course of most days and evenings at 405 Riverside Drive, Lawrence. Ex. 3 at ¶ 19. Further, the data indicated that the phone was stationary at that address most nights and mornings. Ex. 3 at ¶ 19.

During late July and early August 2019, Special Agent Lawrence attempted to identify "Guy."  On July 30, 2019, while conducting surveillance, Special Agent Lawrence observed a Hispanic male, mid- twenties, with a muscular build, exit the third floor apartment of 405 Riverside Drive.  Ex. 3 at ¶ 20.  On August 6, 2020 the cooperating source made a third successful purchase of fentanyl from "Guy." Ex. 3 at ¶¶ 13-18.  Roughly one week later, on August 12, 2019, Special Agent Lawrence observed the same Hispanic male he had seen on July 30, 2019, exit 405 Riverside Drive carrying a black shopping bag and what appeared to be a cell phone.  Ex. 3 at ¶ 21. The man handed the bag to the driver of a parked blue CRV, then returned to 405 Riverside Drive.  Ex. 3 at ¶ 21. At approximately 5:50 p.m. the same Hispanic male left the residence at 405 Riverside Drive carrying a cell phone, got into the CRV, and left the area. Ex. 3 at ¶ 21.

Cell phone location data obtained as a result of the July 26th Warrant indicated that the cell phone used by "Guy" (978-398-7395) was stationary at 405 Riverside Drive on August 12, 2019 between 12:00 am, and 5:49 p.m. Ex. 3 at ¶ 22. The data, which was provided in intervals, indicated that the phone was next located at 6:06 p.m. at (or in a location above) a Metro PCS store in Lawrence. Ex. 3 at ¶ 22.  The store is located at the

3

intersection of Lawrence Street and Trenton Street in Lawrence and is a short distance from 405 Riverside Drive.   Ex. 3 at ¶ 21.

On August 15, 2019 Special Agent Lawrence, together with two OCDETF Task Force Officers, Matthew Heslam and Robert MacHugh, conducted surveillance in the area of 405 Riverside Drive, Lawrence, Massachusetts. Ex. 1 at ¶ 26; Ex. 3 at ¶ 26; Heslam Declaration at ¶ 4.   Thereafter, Special Agent Lawrence, T.F.O. Heslam, and T.F.O. MacHugh stopped a taxi in which the Hispanic male observed by Special Agent Lawrence on July 30 and August 12, and attempted to identify the defendant.   Ex. 1 at ¶ ¶ 26-27; Ex. 3 at ¶ 27; Heslam Declaration at ¶¶ 5-6.   After approaching the taxi, the agents asserted that the driver, not the defendant had committed an infraction.   Ex. 1 at ¶ 5; Heslam Declaration at ¶ 3.   During the stop, which lasted approximately 15 minutes, T.F.O. Heslam took photographs of the taxi and the defendant.   .Heslam Declaration at ¶¶ 5-6.

On October 2, 2019, location data obtained pursuant to a warrant for a phone known to be used by "Guy" was at 44 Butler Street overnight.   Ex. 1 at ¶ 30.   On October 3, 2019 Special Agent Lawrence and Detective David Moynihan of the Lawrence Police Department conducted surveillance of 44 Butler Street, Lawrence.   Id..   At approximately 11:35 a.m. on that date, the defendant was observed exiting the front door of 44 Butler Street.   Id..   The defendant walked up to the passenger side front window of a Dodge Caravan and handed something to the driver. . Id..  The van immediately left the area, and the defendant went back into 44 Butler Street.   Id..

4

On October 3, 2029, in an effort to identify the apartment used by the defendant at 44 Butler Street, Detective Moynihan showed Lawrence Police Officers Alex Ovalles and Officer Eduardo De La Cruz a photograph taken of the defendant during the August 15, 2019 motor vehicle stop. Ex. 1 at ¶ 31; Fonseca Declaration at ¶ 19; Ex. 5 at bates stamp "CARMONA 0001." Officer De La Cruz, who is regularly in the neighborhood, recognized the defendant as someone he had recently seen in the area. Ex. 1 at ¶ 31; Fonseca Declaration at ¶ 20. Detective Moynihan then asked both uniformed officers to go door to door at 44 Butler Street under the guise of serving a fake state court witness subpoena. . Ex. 1 at ¶ 30; Fonseca Declaration at ¶ 20.

The officers then entered the common area of 44 Butler Street. Ex. 1 at ¶ 31; Fonseca Declaration at ¶ 20. Officer Ovalles went to an apartment on the first floor, while Officer De La Cruz headed to the second floor apartment and knocked on the door. Id. The defendant answered the door. Id. Officer De La Cruz, who speaks fluent Spanish, invented a name, and asked the defendant if he was that fictitious person. Id. CARMONA stated that the person the officer was looking for did not live in the apartment. Id. The Officer asked the defendant, "what is your name?" and the defendant answered "Ronald Carmona." Id. Officer De La Cruz asked a second time if the fictitious person lived in the apartment. Id. The defendant answered, "No" and then identified himself a second time as Ronald Carmona. Id.

On October 11, 2019 agents executed the arrest warrant for CARMONA at his residence at 44 Butler Street, second floor apartment. Fonseca Declaration at ¶ 21.

5

CARMONA was arrested and transported to the Lawrence Police Department, where he was booked. Id . During the booking procedure, the defendant identified himself. Id. In addition, officers photographed the defendant. Id.; Ex. 7. The photograph and information regarding identification obtained from the defendant at booking were routine administrative actions that accompany most arrests made by the Lawrence Police Department.

Following the arrest of the defendant on October 11, 2019, agents executed the search warrant for 44 Butler Street, Lawrence, second floor apartment. Ex. 1; Ex. 10. During the execution of the warrant, agents seized three cell phones, including an "LG cell phone." Ex. 10. The FBI has since confirmed that the LG cell phone seized on October 11, 2019 is assigned a telephone number (978-648-0360), previously used by "Guy" to negotiate a drug sale with the government's cooperating source. Fonseca Declaration at 23.

II. Law and Argument

   A.   Standing

The defendant asserts that the Court should exclude from his trial (1) identification evidence seized in violation of his Fourth Amendment rights, and (2) fruits of such evidence. However, "since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, … it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections."

Rakas v. Illinois, 439 U.S. 128, 134 (1978).   In this case, the defendant's amended motion fails twice to establish standing.

First, as the government previously argued, passengers in common carriers, such as taxis, are not necessarily awarded the same standing as passengers in private vehicles. Brendlin v. California, 549 U.S. 249, 257-262 & n.6 (2007).   In Brendlin, the Supreme Court distinguished taxis, noting that in cases involving common carriers, "the crucial question would be whether a reasonable person in the passenger's position would feel free to take steps to terminate the encounter."   Id.at 262 n.6.

The stop at issue in this case took place in broad daylight, minutes from 405 Riverside Drive, a location frequented by the defendant on numerous occasions between July 30, 2019 and the day of the stop.   Ex. 1 at ¶¶ 26-27; Ex. 5; Heslam Declaration at ¶¶ 5-6.   After approaching the taxi, the agents told the driver, that he had committed a motor vehicle infraction.   Ex. 1 at ¶ 5; Heslam Declaration at ¶ 3.   While the assertion was intended to deceive the defendant, neither the taxi nor the defendant were searched. See Ex. 1 at ¶ 5; Heslam Declaration at ¶ 3.   In fact, photographs taken during the stop show a smiling defendant, actually using his phone during the encounter. Ex. 5. Accordingly, the inference is strong that a reasonable person in the passenger's position would feel free to take steps to terminate the encounter.

Even if the Court were to find that the defendant has standing, to challenge the stop of the taxi, nothing in the record supports the finding that the defendant had any expectation of privacy in the items seized from 44 Butler Street.   The defendant's

7

affidavit does not mention 44 Butler Street, nor does it mention evidence seized from 44 Butler Street.   It is settled law that automatic standing no longer exists.   <u>United States v. Salvucci</u>, 448 U.S. 83, 95 (1980).   Nor, does mere presence in an apartment or home, without more, allow a defendant to claim an expectation of privacy.   <u>Minnesota v. Carter</u>, 525 U.S. 83, 89-90 (1998).   Finally, because Fourth Amendment rights are "personal rights" which may not be "vicariously asserted," the fruit of the poisonous tree doctrine does not exclude evidence seized in violation of the rights of another. <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969).   In order to have standing therefore, the defendant must assert an expectation of privacy in the premises at 44 Butler Street, Lawrence on October 11, 2019.   While there may be good reason for failing to do so in this case, the failure to aver any expectation of privacy in the place searched eliminates the defendant's standing to suppress items seized from 44 Butler Street.

   B.   The Investigatory Stop

      Pursuant to <u>Terry v. Ohio</u>,.75 392 U.S. 1 (1968), and its progeny, a law enforcement officer "may conduct a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." <u>United States v. McKoy</u>, 428 F.3d 38, 39 (1st Cir. 2005). The government bears the burden of proving that (1) the stop was justified at its inception, and (2) the scope and duration of the stop were reasonably related to the circumstances which justified the interference in the first place, <u>Terry</u>, 392 U.S. at 20-21; <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 14 (1st Cir. 1998).

In evaluating the first prong of Terry, whether the stop was justified at its inception, the touchstone is whether the agent's beliefs and actions were reasonable under the totality of the circumstances.   Acosta-Colon, 157 at 19; United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006)(courts evaluate each case based on the "totality of the circumstances ... to ascertain whether the officer had a particularized, objectively reasonable basis for suspecting wrong doing (and, thus, for making the initial stop)"); United States v. Romain, 393 F.3d 63, 70- 71(1st Cir. 2004).

In this case, location data obtained as a result of the July 26th Warrant indicated that a cell phone used by "Guy" to arrange the sale of fentanyl to a cooperating source as recently as August 6, 2019 was frequently used over the course of most days and evenings at 405 Riverside Drive, Lawrence.   Ex. 3 at ¶ 19.   The phone was stationary at that address most nights and mornings.   Id.   Special Agent Lawrence observed the defendant leaving 405 Riverside Drive on July 30, August 12, and August 15.   Ex. 3 at ¶ ¶ 20, 21 and 26.   Location data for "Guy's" cell phone demonstrated that the phone appeared to move at the same time that the defendant was observed leaving 405 Riverside Drive on August 12, 2019.   Ex. 3 at ¶ ¶ 21-22.   For these reasons, on August 15, 2019 Special Agent Lawrence and other agents working on the investigation had reasonable suspicion that the defendant was engaged in a conspiracy to distribute fentanyl, as well as probable cause to believe that he had sold fentanyl to a cooperating source on several occasions during the summer of 2019.   Heslam Declaration at ¶5.   Accordingly, the stop of the taxi in order to identify the defendant was justified at its inception.

The scope and duration of the stop on August 15, 2019 easily satisfy the second prong of Terry, since taking photographs of the defendant is plainly and reasonably related to the purpose of identifying "Guy."  Moreover, it is well settled that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967); see also United States v. Dionisio, 410 U.S. 1, 14 (1973).[3]

Additionally, in Hayes v. Florida, 470 U.S. 811, 816–17(1985)(citing cases) the Supreme Court reaffirmed that if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information. suppressing the stop at issue.  After suppressing evidence obtained following the detention and transport of the defendant to a police station for fingerprinting, the Court asserted that "none of the foregoing implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, is necessarily impermissible under the Fourth Amendment."  Here, photographing the defendant was less intrusive and less time consuming than fingerprinting in the field.

---

3  Whether, and to what extent, the Fourth Amendment is implicated by pole camera footage, a matter currently under consideration in the First Circuit, see 2020 WL 7251410, December 9, 2020 is markedly different than the 15 minute stop resulting in four single photographs at issue in the present case.

Last, the length of the detention on August 15, 2019 was also within acceptable limits.  See United States v. Sharpe, 470 U.S. 675, 686 (1985).   Agents estimate that the taxi was stopped approximately 15 minutes, during which time they attempted to (a) learn the defendant's identity, and (b) check for warrants.  Ex. 3 at ¶ 27.  The First Circuit has plainly affirmed the reasonableness of similar stops.  United States v. Chaney, 584 F. 3d 20, 26 (1st Cir. 2009), United States v. Clark, 879 F. 3d 1, 5 (1st Cir. 2018).

Accordingly, the scope and duration of the investigatory stop on August 15, 2019 were reasonably related to the initial justification for the stop.

  C.  The Arrest and Booking

The Defendant also asserts that his arrest, and his subsequent booking, were the fruits of the stop on August 15, 2019 and as such, evidence of his identification must be suppressed.   However, even if the stop of the taxi were deemed illegal, a person's identity cannot be suppressed as a fruit of an illegal arrest. INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant . . . is never itself suppressible as a fruit of an unlawful arrest.").   Moreover, as this Court noted in its procedural order dated November 30, 2020, the First Circuit recently considered the exclusion of evidence of identity obtained during booking procedures that followed an arrest made without probable cause in United States v. Cruz-Mercedes, 945 F.3d 569, 574-77 (1st   Cir. 2019).   The Cruz-Mercedes Court refused to suppress identity evidence obtained from a routine, administrative booking procedure after considering the

11

"context and investigatory motivation" behind law enforcement obtaining of the challenged evidence.  Id. at 575-76.

Here, the defendant was booked by the Lawrence Police in a manner consistent with ordinary post arrest administration.  Declaration of FBI Special Agent Albert Fonseca, at ¶ 21 and Ex. 7.  Accordingly, the defendant's arrest, as well as evidence of identity obtained during booking, should not be suppressed.

   D.   Franks v. Delaware

Cognizant of the government's argument regarding justification for the investigatory stop of the defendant, counsel suddenly[4] adds agent misconduct as grounds to suppress the photograph used to identify the second floor apartment at 44 Butler Street, as well as items seized from that apartment.  Specifically, the defendant now alleges that Special Agent Lawrence deliberately or recklessly failed to inform the magistrate that the investigatory stop was not justified by a civil motor vehicle infraction, or that agents making the stop did not have the authority to cite the taxi operator for a motor vehicle violation.  D. 82 at ¶ 19.

---

4  In his report describing the August 15, 2019 stop, Special Agent Lawrence stated, "[a]t approximately 6:05 PM, SA Lawrence and TFO Heslam conducted a motor vehicle stop of the taxi to identify the subject holding the dispatch phone. The operator was told that he was being stopped for a motor vehicle violation."  Ex. 4 at 1.  It is worth noting that the report was provided in discovery in January 2020, months before the defendant filed his initial motion to suppress.

12

Under Franks v. Delaware, 438 U.S. 154 (1978), a hearing is warranted where the defendant makes a "substantial preliminary showing" that: (1) the affiant's statement was deliberately false or demonstrated reckless disregard for the truth, id. at 155-56, 171, and; (2) the challenged statement or omission was essential to the magistrate's finding of probable cause. Id. at 155-56, 171-72.  Put simply, the defendant fails to satisfy either prong.

First, in attempting to offer proof that the affiant made a deliberate of reckless omission, counsel portrays the government's initial memorandum in opposition, D. 63 at 4-5, as a concession that the affidavit was misleading.   The assertion is plainly incorrect. The government merely sought to demonstrate the difference between the agent's true justification for the stop, and what the agents told the driver of the taxi.   Nothing required the agents, who were engaged in a drug trafficking investigation, to give the driver of the taxi truthful reasons for the stop.

Regardless, the language used in the affidavit was not misleading, nor is there any evidence that the magistrate's decision regarding probable cause was influenced by an omission.   First, the affidavit does not allege a motor vehicle violation as grounds for the stop, nor can it be said that the magistrate was misled into believing that the stop was justified by a motor vehicle violation.[5]   Here, the affidavit exhaustively demonstrates that

---

5  To the contrary, if the purpose of the stop was a motor vehicle infraction, then the government was required to prove that there was probable cause to believe a motor vehicle infraction had occurred.  Whren v. United States, 517 U.S. 806, 810 (1986)(" As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

13

agents stopped the taxi in order to identify the person they believed was engaged in a conspiracy to distribute fentanyl. [6]  The affidavit details three completed drug sales, and one attempted sale, with "Guy" prior to the stop on August 15, 2019.  Ex. 1 at ¶¶ 9-17.  Thereafter, in a section entitled "Identification of CARMONA and Target Location 1," the affidavit discusses efforts to identify "Guy"  Ex. 1 at ¶¶ 26-28.  It is in that section of the affidavit that Special Agent Lawrence discussed stopping the taxi.

While it is true that the affidavit refers to the encounter as a "motor vehicle stop," there is nothing misleading about the use of that phrase.  On August 15, 2019 the defendant *was* a passenger in a motor vehicle, and that motor vehicle *was* stopped.  The absurdity of the defendant's argument is belied by the fact that counsel for the defendant repeatedly uses the same phrase when describing the Terry stop in his brief.  D. 872 at 1 ("]T]he defendant in the above-entitled matter … hereby moves the Court, … to suppress all evidence seized during the course of a ***motor vehicle stop*** on August 15, 2019…."); and at ¶ 8 ("After following the taxi for a short distance, a ***motor vehicle stop*** was conducted.")(emphasis added).  Counsel uses the phrase knowing that there was no motor vehicle violation.  The government submits that the phrase was used because it accurately describes the encounter.

Equally important, in the very first paragraph of his affidavit, Special Agent Lawrence described himself as a special agent with the FBI.  Ex.1 at ¶ 1.  To find that

---

6  The 19 page affidavit was clearly a good faith effort to seek review from a neutral magistrate.  See United States v. Leon, 468 U.S. 897 (1984) and its progeny.

14

the defendant has made the "substantial showing" necessary to justify a <u>Franks</u> hearing, asks the Court to find that the magistrate in this case was falsely led to believe that the FBI enforces traffic violations.   The request for a <u>Frank</u>'s hearing should be denied.

E.   A Decision on the Papers

Evidentiary hearings on pre-trial motions are not granted as a matter of course. <u>See</u>, <u>e.g</u>., <u>United States v. Panitz</u>, 907 F.2d 1267, 1273 (1st Cir. 1990); <u>United States v. Pellerito</u>, 878 F.2d 1535, 1545 (1st Cir. 1989).   A hearing is required only if the moving party makes a sufficient threshold showing that material facts are in doubt or dispute and that the dispute cannot reliably be resolved on a paper record. <u>United States v. Jimenez</u>, 419 F.3d 34, 42 (1st Cir. 2005); <u>United States v. Panitz</u>, 907 F.2d 1267, 1273 (1st Cir. 1990) ("[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion"). The First Circuit has held time and again that failure to raise a material disputed factual issue that would entitle the defendant to the relief he seeks is grounds for denying an evidentiary hearing. <u>See</u> <u>e.g</u>., <u>United States v. Calderon</u>, 77 F.3d 6, 9 (1st Cir. 1996).   The First Circuit has also noted that a court may give the government an opportunity to present its evidence on the validity of the warrant without holding a full evidentiary <u>Franks</u> hearing. <u>See</u> <u>United States v. Graf</u>, 2015 WL 1788217 n.7 (1st Cir. Apr. 21, 2015).

Here, -the defendant does not offer any countervailing facts of his own regarding the events giving rise to the search. He merely complains that (a) as a matter of law the

15

Fourth Amendment requires suppression of evidence obtained as the result of a motor vehicle stop, and (2) an alleged omission, that is not supported by the plain language of the affidavit at issue, requires a Frank's hearing.   Accordingly, the Court now has the factual information necessary to decide Carmona's motion without a hearing.

III. Conclusion

For the foregoing reasons, the government opposes the Defendant's Amended Motion.

Respectfully submitted,

ANDREW E.   LELLING
United States Attorney

By:

/s/ K. Nathaniel Yeager
K. NATHANIEL YEAGER (630992)
Assistant U.S. Attorney
(617)748-3100

Date:   December 16, 2020

Certificate of Service

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendants.

By: /s/ K. Nathaniel Yeager

16

K. NATHANIEL YEAGER
Assistant United States Attorney